ELSA MILÁN RODRÍGUEZ, demandante y recurrida, *v.* ENSOR MUÑOZ GIL DE LAMADRID, demandado y peticionario.

*Número:* O-80-445    *Resuelto:* 15 de enero de 1981

*José Elías Zayas,* abogado del peticionario; *José E. Vilá Barnés,* abogado de la recurrida; *Héctor A. Colón Cruz, Procurador General* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

A manera de trasfondo conceptual para la solución de este caso y con referencia a la evolución jurídica de la condición de la mujer, evocamos las siguientes palabras: "[l]os cambiados artículos suponen el reconocimiento, por el legislador, de unas realidades sociales que hasta ahora no habían trascendido al campo del Derecho (la norma, casi siempre en retraso frente a la vida) : la nueva identidad de la esposa, que no se define ya exclusivamente como madre y animal doméstico o de labor dentro de la casa, *sino como ser con dignidad y libertad iguales a las del varón, y por tanto con derecho a que, como regla general, se le deparen las mismas oportunidades y posibilidades jurídicas".* J. L. Lacruz Berdejo, *El Nuevo Derecho Civil de la Mujer Casada,* Madrid, Ed. Civitas, S.A., 1975, pág. 23. (Bastardillas nuestras.)

Manteniendo en mente las mismas, nos pronunciamos sobre la validez constitucional del Art. 109 del Código Civil —no tocado en esa reforma— que en lo pertinente reza:

Si la mujer que ha obtenido el divorcio no cuenta con suficientes medios para vivir, el Tribunal Superior podrá asignarle alimentos discrecionales de los ingresos, rentas, sueldos o bienes que sean de la propiedad del marido, sin que pueda exceder la pensión alimenticia de la cuarta parte de los ingresos, rentas o sueldos percibidos. 31 L.P.R.A. sec. 385.

## I

Las partes se divorciaron por la causal de abandono. Durante el matrimonio no procrearon hijos. Subsiguientemente,

Elsa Milán Rodríguez, en calidad de cónyuge inocente, solicitó pensión alimenticia en virtud del transcrito artículo. Su ex-esposo, aquí peticionario, Ensor Muñoz Gil De Lamadrid, se opuso impugnando la constitucionalidad de dicho precepto por alegadamente representar una clasificación discriminatoria a base de sexo y privarle de la igual protección de las leyes, en contravención al primicial mandato plasmado en la Carta de Derechos de nuestra Ley Fundamental:

La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la ley*. No podrá establecerse *discrimen alguno* por motivo de raza, color, *sexo*, nacimiento, o condición social, ni ideas jurídicas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Bastardillas nuestras.)

El planteamiento no prosperó y el ilustrado foro de instancia negó la desestimación. En síntesis resolvió, ". . . que estamos obligados a suplir la omisión del *Artículo 109* y armonizarlo de tal manera que no quede duda de que dicho *Artículo* no hace una distinción discriminatoria, porque aun cuando le impone la obligación al hombre de proveer alimentos a la mujer, *no prohíbe que a su vez un Tribunal le imponga una pensión alimenticia a la mujer en favor de su ex-esposo cuando la situación de éste lo requiera y la situación de aquélla lo permita*." (Bastardillas nuestras.) Revisamos.

## II

La genealogía de la disposición que nos ocupa se remonta al Art. 177 del Código Civil de 1902 procedente, a su vez, del 160 del Código Civil del estado de Louisiana.(¹) A su amparo,

---

(¹)*Loyacano* v. *Loyacano*, 358 So.2d 304 (1978). Es de notarse que el Art. 301 del Código Napoleónico concedía a ambos cónyuges, ante circunstancias imperiosas, el derecho a recibir pensión alimenticia en caso de divorcio. Este precepto no fue incorporado al Código Civil de Louisiana. Dicha jurisdicción evolucionó estatutariamente hacia el texto que se ha importado aquí. D. E. Ried, Note: *Alimony and Equal Protection: A Search for Rational Relationships*, 22 Loyola L. Rev. 1036–1060 (1976); *Loyacano*, pág. 312.

desde principios de siglo reconocimos a la mujer el derecho a pensión post-divorcio, si ella demostraba hallarse en las circunstancias allí prescritas. La obligación recaía siempre sobre el esposo. *Morales* v. *Rivera*, 8 D.P.R. 463 (1905); *Puigdollers* v. *Monroig*, 26 D.P.R. 310 (1918); *Sacarello* v. *Rubio*, 44 D.P.R. 883 (1933); *Meléndez* v. *Tribl. Superior*, 77 D.P.R. 535 (1954); *Suria* v. *Fernández Negrón*, 101 D.P.R. 316, 318 (1973). En este último caso precisamos la característica *dinámica* que entraña el concepto de *alimentos*, exponiendo que "se reclaman o se dispensan al ritmo de las circunstancias cambiantes de alimentante y alimentista". Pág. 320.

Debido a su antigüedad, carecemos de un Diario de Sesiones que de modo más científico nos permita investigar los motivos legislativos que impulsaron su redacción original. Aún así, de su lectura podemos extraer que la hipótesis central en que descansa es que la mujer se encuentra en condiciones de inferioridad económica. Este supuesto, posiblemente válido hace varias décadas, formaba parte del armazón y diseño jurídico que situaba a la mujer en una posición de estricta sumisión y absoluta fragilidad frente al hombre, lo que, a su vez, exigía una defensa legal superior y una protección económica mayor. Específicamente podemos detectar como tesis primaria que casi todos los ex-maridos, en contraste con las esposas, cuantitativa y cualificativamente, son de incuestionable solvencia económica y autosuficiencia. De lo contrario ¿cómo se explica el lenguaje que les impone para el solo beneficio de la mujer una pensión de hasta una cuarta (¼) parte de sus ingresos?

Aceptamos que existe un interés apremiante y legítimo del Estado en la reglamentación de las relaciones familiares y alimentos entre parientes. Como atinadamente expone Manresa, citando a Arrazola:

"El ser humano, que viene a la vida con el destino que le señale su propia naturaleza, tiene un derecho a la existencia y al

desarrollo de la misma según sus facultades; es decir, tiene un derecho absoluto a su conservación. En la organización actual de la familia y de la sociedad se halla impuesta, primero a los parientes y después al Estado, la obligación de proveer a dicha necesidad; y cada uno en su caso está en el deber de procurar al que por sí no podría cumplir dicho fin, los medios necesarios para su conservación y desarrollo: deber altamente social, que no depende de la voluntad del que le tiene, sino que se impone a todos como una de las condiciones necesarias de la vida progresiva de la humanidad." Manresa, *Comentarios al Código Civil Español,* Madrid, Ed. Reus, 1956, Vol. I, págs. 782–783.

■ Resulta genuino el propósito gubernamental de que durante la vigencia del matrimonio, *al igual que una vez rota esa unión,* exista y subsista potencialmente la obligación de prestar alimentos al ex-cónyuge. Independientemente de que este deber esté o no basado en el *derecho a la existencia* proclamado por Arrazola, o fundado en otras razones tales como los sentimientos de cariño y afecto que nacen en el seno familiar, los principios filosóficos, éticos y morales de solidaridad humana, o en motivaciones de tipo religiosas —piedad o caridad— ciertamente se justifica el interés, la intervención y reglamentación del Estado en materia de prestación de alimentos bajo la premisa, incuestionablemente válida, de que sobre los fondos y el erario públicos no debe exclusivamente recaer la obligación de proveer para la subsistencia de los menesterosos.

Ahora bien, lo que plantea serias cuestiones en el caso de autos, claro está, es que el interés del Estado en el área de la prestación de alimentos post-divorcio parece operar en beneficio de un solo sexo, por cuanto es únicamente la mujer y no el hombre quien aparentemente puede solicitarlos. (²) Estas dificultades se agudizan al percatarnos de que aparte de las

---

(²) Adviértase, además, que toda vez que la necesidad del alimentista se convierte en la obligación del alimentante de proveerlos, el interés del Estado en favor de la mujer divorciada opera, además, como carga exclusiva sobre el hombre divorciado.

diferencias innatas resultantes de la conformación anatómica y aquellas intangibles del campo sicológico sobre las cuales no nos es permisible especular —tales como cualidades afectivas, reacciones y otras— en el mundo cambiante de las realidades, claramente la necesidad de una persona recibir "alimentos y habitación" para subsistir con un mínimo de decoro, no es condición privativa del sexo femenino. Más bien es una circunstancia neutral e inmanente que se origina en la naturaleza misma y que crudamente se proyecta, a cualquier edad, sobre toda la especie humana, sea varón o mujer.

En *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975), y *Comisión Asuntos de la Mujer* v. *Srio. de Justicia*, 109 D.P.R. 715 (1980), —bajo el Art. II, Secs. 1 y 7 prohibitivas del discrimen por razón de sexo y la desigual protección de las leyes— resolvimos aplicar a casos de esta índole la fórmula de *estricta supervisión judicial*. En ambas decisiones advertimos la tendencia irreversible de la mujer a incorporarse a las diversas fases de la actividad económica, profesional y social de manera sustancial. Allí cuestionamos seriamente la validez de "premisas subjetivas, erróneas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconscientemente tiene su razón de ser en la caracterización de la mujer como sexo débil". Como resultado de ese análisis anulamos dos disposiciones legislativas, una en el ámbito laboral relativa a las condiciones del trabajo durante horas de almuerzo —Ley Núm. 105 de 6 de junio de 1967 (29 L.P.R.A. sec. 458)— y otra que exigía la corroboración cualificada del testimonio de la perjudicada en procesos por delito de violación o tentativa de cometerlo (Regla 154 de Procedimiento Criminal).

Con esta perspectiva en mente, no es menester mucho esfuerzo mental ni una exhaustiva elaboración para concluir que el esquema legislativo cristalizado en el artículo en cuestión representa, de su faz y sin lugar a dudas, un trato diferente, injustificado y discriminatorio contra el hombre por

razón de sexo, que al presente —bajo el prisma de un riguroso escrutinio judicial y a menos que oportunamente detectemos la cualidad de doble refracción— no puede prevalecer. Sus antecedentes demuestran que su texto —inalterado hasta la actualidad por más de cien años— más bien responde a una concepción arcaica y estereotipada de la función tradicional limitada que indefectiblemente se le atribuía en el antaño a la mujer: hogar y madre. El precepto refleja un enfoque que se ha quedado rezagado en la reforma y modernización de la condición jurídica de la mujer, que metódicamente ha llevado a efecto la Asamblea Legislativa(³) en los últimos años, en su

(³)El panorama legislativo demuestra irrefutablemente una clara inclinación a salvar todo discrimen contra la mujer, inclusive entre cónyuges: vigente el matrimonio, durante un proceso de divorcio y con posterioridad. Los siguientes estatutos son reveladores de esta tendencia: Ley Núm. 21 de 6 de agosto de 1975, que prohíbe todo discrimen por razón de sexo en el servicio público; Ley Núm. 58 de 22 de junio de 1975, que autoriza expresamente al Secretario del Trabajo a investigar tales discrímenes; Ley Núm. 51 de 21 de mayo de 1976 enmendatoria de los Arts. 91, 93, 1308 y 1313 del Código Civil —y derogatoria de los Arts. 1312 y 1333 de dicho cuerpo— para disponer la co-administración por ambos cónyuges de la Sociedad Legal de Gananciales; Ley Núm. 99 de 2 de junio de 1976 enmendatoria de los Arts. 152, 154, 162, 165, 233 y 237 del Código Civil para reconocer a ambos progenitores, como regla general, la patria potestad sobre sus hijos; Ley Núm. 100 de 2 de junio de 1976 que enmienda el Art. 107 del Código Civil a los fines de reconocer a cualesquiera de los padres la posible adjudicación de la custodia y patria potestad de los hijos menores *después* del divorcio; Ley Núm. 83 de 30 de mayo de 1976 que enmienda los Arts. 178 y 186 para prohibir todo discrimen por razón de sexo o parentesco en la selección de personas llamadas por ley a ser tutores de menores, locos o sordomudos; Ley Núm. 111 de 2 de junio de 1976 que enmienda el Art. 90 del Código Civil que exige que la mujer obedezca y siga al marido dondequiera que éste fije su residencia y para disponer que los cónyuges decidan, por común acuerdo, dónde establecer el domicilio y residencia en la consecución de los mejores intereses de la familia; Ley Núm. 101 de 2 de junio de 1976 enmendatoria del inciso 9 del Art. 96 del Código Civil, —causal de separación en casos de divorcio— que elimina el concepto de culpabilidad del marido; Ley Núm. 84 de 30 de mayo de 1976 que enmienda los Arts. 99, 100, 101 y equipara a ambos cónyuges en las medidas provisionales durante el procedimiento de divorcio para que no se discrimine por razón de sexo, y que las mismas sean también aplicables a los procedimientos sobre nulidad de matrimonio; Ley Núm. 112 de 2 de junio de 1976 que enmienda el Art. 100 del Código Civil y *reconoce al marido los mismos derechos de pensión alimenticia a sufragarse por la*

afán de nivelación y de darle vigencia al ideal de la Asamblea Constituyente de "reconocer el advenimiento de la mujer a la plenitud del derecho, y a la igualdad de oportunidades con el hombre". *Zachry*, pág. 280. Aclaramos que ninguna razón válida o de peso nos ha brindado el Estado para tan cruda diferenciación. Ninguna tampoco hemos encontrado que la justifique. (⁴)

### III

■ Establecido el carácter discriminatorio del Art. 109, resta examinar la corrección del dictamen de instancia sosteniéndolo bajo la fórmula de que el citado precepto extiende su protección tanto al hombre como a la mujer. A tal efecto, dicho foro razonó que ". . . la mujer fue prosperando social, intelectual y económicamente hasta llegar a la mujer de 1980. Con mayor oportunidad de educación, de competencia en el mercado de empleo. Con una Constitución que impide el discrimen por razón de sexo. El enfoque e interpretación de las leyes tiene que ser diferente. Hoy los dos tienen iguales oportunidades lo·que implica deberes. Puede por circunstancias especiales una mujer tener la necesidad, llenando todos los requisitos de ley, [de] utilizar la protección que le ofrece el Artículo 109, y puede de la misma forma el hombre de hoy, al cual la mujer se ha equiparado en el campo social, intelectual y económico, verse en la necesidad de ·por razones muy parti-

---

mujer, *durante los trámites de juicio de divorcio;* Ley Núm. 10 de 21 de julio de 1977 que enmienda los Arts. 156, 157, 159, 160 del Código Civil para que la patria potestad respecto a los *bienes* de los hijos se ejerza por ambos padres conjuntamente o aquel que tenga bajo su potestad y custodia al menor; Ley Núm. 6 de 1 de febrero de 1979, que adiciona la Regla 154.1 de Procedimiento Criminal para prohibir admisión automática en evidencia de conducta previa a historial sexual de perjudicada en casos de violación y autoriza vista privada sin jurado a tales fines; y la Ley Núm. 1 de 27 de mayo de 1980, enmendatoria del Art. 152 del Código Civil que autoriza a cualesquiera de los padres, en caso de tratamiento médico y operación de emergencia de un hijo, a otorgar el consentimiento.

(⁴) Alegatos separados del Procurador General y de la demandante-recurrida Elsa Milán Rodríguez.

culares, y llenando todos los requisitos de ley, utilizar la protección que el Artículo 109 le ofrece".

■ Merece nuestra aprobación el resultado a que llegó la ilustrada sala de instancia. En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por sub-inclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos. *Orr* v. *Orr,* 440 U.S. 268 (1979) ; (⁵) *Frontiero* v. *Richardson,* 411 U.S. 677 (1973) ; *Weinberger* v. *Wiesenfeld,* 420 U.S. 636 (1975) ; *Califano* v. *Goldfarb,* 430 U.S. 199 (1977) ; *Welsh* v. *United States,* 398 U.S. 333, 361 (1970) —opinión concurrente Juez Asociado Señor Harlan. La regla es consustancial con el principio de que el Poder Judicial —en abono de una deferencia hacia el Poder Legislativo— debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su operación, a diferencia de éste,

---

(⁵) En este caso el Tribunal Supremo federal decretó que un estatuto parecido al Art. 109 violaba la cláusula decimocuarta sobre igual protección. Remitió el caso al foro de Alabama para que ellos determinaran si la disparidad era salvable reconociendo a los ex-maridos igual derecho. Los tribunales de dicho estado así lo hicieron. *Orr* v. *Orr,* 374 So.2d 895 (1979), *cert.* denegado 100 S.E. 993 (1980). Iguales soluciones proveyeron la Corte Suprema de Maine en *Beal* v. *Beal,* 388 A.2d 72 (1978), y la de New York en *Thaler* v. *Thaler,* 391 N.Y.S.2d 331 (1977).

Sobre este tema en particular, consúltese: Nota: *Orr* v. *Orr,* 23 How. L.J. 559-575 (1980) ; Nota: *Alimony Awards Under Middle—Tier Equal Protection Scrutiny,* 59 Nebraska L. Rev. 172 (1980) ; Nota: *Financial Equality in Marriage and Parenthood: Sharing the Burdens as Well as the Benefits,* 29 Catholic Univ. L. Rev. 733 (1980) ; E. A. Hull, *Sex Discrimination and the Equal Protection Clause: An Analysis of Khan v. Shevin and Orr v. Orr,* 30 Syracuse L. Rev. 639 (1979) ; Nota: *Alimony and Equal Protection: Mid Level Scrutiny of Gender-Based Classifications Continues,* 25 Loyola L. Rev. 809 (1979) ; Nota: *Constitutional Law,* 18 Journal of Family Law 192 (1979–80) ; Cipen & Cipen, *Alimony for Husbands: Is There True Equality,* 52 Florida Bar Journal 201 (1978) ; Nota: *Alimony for Men—The Changing Law,* 7 Florida State Law R. 687 (1979) ; *Male Alimony in Light of the Sex Discrimination Decisions of the Supreme Court,* 6 Cumberland L. Rev. 589 (1976) ; *Orr v. Orr: Predictable Result, Unpredictable Repercussions?,* 10 Cumberland L. Rev. 531 (1979) ; Nota: *Orr v. Orr,* 13 Akron L. Rev. 175 (1979).

sin embargo, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la *extensión* de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen.

En esta tarea judicial, el criterio rector lo constituye, por tanto, la importancia "[d]el *motivo* legislativo presumido". L. Kanowitz, *"Benign" Sex Dscrimination: Its Trouble and Their Cure*, 31 Hastings L.J. 1379, 1413 (1980). En esta misión de averiguar la *mens* legislativa hemos de evitar guiarnos, en lo posible, por una mecánica literal y eludir mirar las palabras y frases con una óptica empañada, estereotipada o de clisé que adjudique a dicho Poder un interés a destiempo discriminatorio y excluyente.

En virtud de lo anteriormente expuesto, al confrontarnos con la alternativa de anular el Art. 109 del Código Civil o extender su ámbito protector a la clase excluida, estimamos que ante la importancia del propósito legislativo en él encarnado, así como para superar todo discrimen injustificado por razón de sexo, y la urgencia de mantener incólume los beneficios que hasta ahora ha conferido la reglamentación sobre el deber de alimentos, la segunda opción es la única apropiada. Por ende, decretamos que la norma de derecho consignada en dicho artículo no prohíbe, en situaciones meritorias análogas a las allí visualizadas, que los tribunales impongan a una mujer divorciada el deber de prestar una pensión alimenticia para beneficio de su ex-cónyuge varón. Sostenemos su constitucionalidad.

*Se dictará sentencia confirmatoria.*

Los Jueces Asociados Señores Rigau y Martín concurren en el resultado sin opinión. El Juez Asociado Señor Díaz Cruz emitió voto concurrente al que se une el Juez Asociado Señor Irizarry Yunqué, quien está, además, conforme con la opinión del Tribunal.

—O—

Voto concurrente del Juez Asociado Señor Díaz Cruz al que se
une el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 15 de enero de 1981

Concurro exclusivamente en el resultado porque estimo que
los fundamentos de decisión deben fluir de la norma jurídica
de igualdad y universalidad enunciada en el Título Preliminar
de nuestro Código Civil, las reglas de interpretación de las
leyes contenidas en los Arts. 18 y 19 del Código y la vasta
jurisprudencia patria.

El fin supremo del Código Civil, su principio inmanente,
está declarado en el Art. 22 como: "La ley civil es igual para
todos, sin distinción de personas ni de sexo". La cláusula que
a renglón seguido reconoce excepción para "los casos en que
especialmente se declare lo contrario" plantea un conflicto
interno en el mismo artículo que puede y debe resolverse sin
llamar a la noche día, y sin confrontaciones constitucionales;
simplemente identificando el propósito auténtico de la ley que
es la igual protección de las personas y quitando toda coerci-
tividad a la excepción. "[E]l Derecho tiene su fundamento en
la moral, y las normas jurídicas son una derivación de las
leyes éticas y morales."[1] "Una norma —dice Coviello—
que no regule una relación por vía general abstracta no puede
considerarse jurídica; siendo el Derecho una regla de coexis-
tencia social, implica orden, *igualdad*, exclusión de arbitrio
individual, y estos efectos suponen que la norma sea estable-
cida como general y abstracta."[2] (Énfasis suplido.)

El Art. 109 del Código Civil, 31 L.P.R.A. sec. 385, debe
leerse como norma abstracta que brinda igual protección
*a ambos ex-cónyuges*, reconciliada con la finalidad del orden

---

[1] Castán Tobeñas, *Derecho Civil Español, Común y Foral*, 10ma ed.,
1962, T. 1, Vol. 1, pág. 48.

[2] *Mannuale di diritto civile italiano*, *Parte Generale*, 2da ed., pág. 9,
citado por Castán, *op. cit.*, págs. 53–54.

jurídico proclamada en el Art. 22 del Código como ley igual para todos, sin distinción de personas ni de sexo.

La interpretación judicial puede, en caso de conflicto entre disposiciones de la ley, reivindicar su valor ético de esencial justicia, negando eficacia a la parte que resulta incompatible con el propósito legislado. Así lo acordó este Tribunal por voz del Juez Benjamín Ortiz al declarar: "Nuestra obligación fundamental, en estos casos, es la de imprimirle efectividad a la intención legislativa, aún hasta el punto de sustituir o eliminar judicialmente alguna frase específica estatutaria que, con diáfana claridad, haya sido incorporada a un estatuto por inadvertencia o error, hasta el punto de que esa frase derrote obviamente la intención legislativa que surja de la totalidad de la ley, ya que, en esos casos, debe prevalecer la manifiesta intención del legislador sobre la disposición literal del estatuto que esté en conflicto con esa intención". *Roig Commercial Bank* v. *Buscaglia, Tes.*, 74 D.P.R. 986, 997–8 (1953). *Cf. Clínica Juliá* v. *Sec. de Hacienda*, 76 D.P.R. 509, 520 y ss. (1954); *Banuchi* v. *Corte*, 64 D.P.R. 112, 120 (1944); *Descartes, Tes.* v. *Tribl. Contrib. y Sucn. Cautiño*, 71 D.P.R. 248, 253 (1950); *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 43–44 (1950); *Calaf* v. *Sec. Hacienda*, 76 D.P.R. 577, 584 (1954).