Voto particular disidente emitido por la
Jueza Asociada Se-ñora Fiol Matta.
Disiento enérgicamente de la decisión que toma una *994 mayoría de este Tribunal porque es contraria a nuestro ordenamiento constitucional, no responde a la realidad que vive nuestra sociedad, incumple la función principal del poder judicial, y, lo más lamentable, resulta en detrimento del bienestar de una niña.
Los hechos de este caso y los informes periciales apun-tan claramente a que AAR es y siempre ha sido madre de la menor JMAV, y como tal le ha provisto todo el cariño, los recursos y la protección que la niña ha requerido.(1) Asi-mismo, las evaluaciones contenidas en el expediente del recurso explican que la menor y sus dos madres están pre-paradas psicológica y emocionalmente para el proceso judicial que reconocería legalmente lo que ya es una realidad. También demuestran que la adopción de JMAV por AAR sin romper los vínculos con su otra madre, CVV, es benefi-ciosa para la niña, pues le permitirá contar, al igual que otros menores, con dos personas que compartan la respon-sabilidad legal de cuidarla, proveerle un hogar, brindarle alimentos, velar por su educación, tomar decisiones juicio-sas sobre su atención médica y garantizarle su acceso a planes médicos, pensiones, seguros y herencias. Es obvio que lo más favorable para JMAV es que se fortalezca su relación con sus dos madres a través de la declaración legal de ambos vínculos familiares.
I
La norma de autolimitación judicial que se ha impuesto este Tribunal requiere que decidamos sobre la constitucio-nalidad de una ley sólo cuando no haya otra manera de adjudicar la controversia ante nuestra consideración. Esta regla básica de derecho constitucional nos permite inter- *995 pretar y aplicar una disposición, de forma que no viole nuestras máximas constitucionales, para evitar declararla inconstitucional.(2) Cuando se aplica esta limitación au-toimpuesta, no significa que el análisis constitucional está vedado o es incompatible, sino que preferimos tomar otro camino para salvar el producto de la Legislatura sin violar principios fundamentales para nuestra sociedad.
En este caso, hay una vía para evitar la adjudicación constitucional: acoger en nuestra jurisdicción la figura del second parent adoption a base de nuestra fuerte política pública de favorecer el mejor bienestar de los menores de edad.
El propósito de romper los vínculos con la familia anterior cuando se adopta a un niño es facilitar su adaptación a una nueva familia y extinguir lazos que pudieran resultar nocivos en situaciones en que el menor, por ejemplo, haya sido maltratado u abandonado.(3) Esto se debe a que el norte de nuestra Ley de Adopción, tanto de la actual como de las anteriores, es procurar lo más conveniente para los niños y las niñas. Por eso, cuando la disolución de la rela-ción jurídica con uno de los progenitores del menor reco-mendada por la ley se enfrenta al mejor bienestar de ese niño, es el interés del menor lo que debe prevalecer.(4)
*996 Es aquí que entra al juego la figura del second parent adoption, una solución acogida en múltiples jurisdicciones para beneficiar a los menores que son fruto de las familias no tradicionales que abundan actualmente. Mediante esta figura, un tribunal puede permitir que un niño sea adop-tado por la pareja consensual de su madre o padre legal, sin que pierda el vínculo jurídico con este último, si esa adopción propicia el bienestar y la seguridad del niño.(5)
Este Tribunal no sólo tiene el poder para hacer esa de-terminación, sino que tiene el deber legal de velar por el mejor interés de los menores. Lo más conveniente para la menor JMAV es ser reconocida legalmente como hija de CW y AAR, por lo que este Tribunal debió dar paso a la adopción solicitada. Si así lo hubiera hecho, hubiéramos podido prescindir de toda la discusión constitucional conte-nida en las opiniones del caso de epígrafe.
II
No obstante lo anterior, una mayoría de este Tribunal rechaza la propuesta de las peticionarias y nos obliga a hacer un segundo análisis, esta vez sobre la constituciona-lidad de los Artículos 137 y 138 del Código Civil.(6)
Nuestro mandato constitucional de igual protección de las leyes prohíbe tratos desiguales injustificados a perso-nas situadas en condiciones similares. El Artículo 137 dis-pone que la adopción extingue los vínculos jurídicos entre el adoptado y su familia biológica o adoptiva anterior. El Artículo 138 establece dos excepciones a esta norma que sólo están disponibles para parejas heterosexuales. Una es que la persona que quiere adoptar esté casada con la ma- *997 dre o el padre legal del niño; la otra es que la persona adoptante sea del sexo opuesto al de la madre o el padre legal del niño con una sola filiación. Así, la clasificación que el Artículo 138 establece entre personas que desean adoptar a un menor no está basada en sus capacidades para velar por el bienestar de un niño sino en su sexo y, en gran medida, en la relación sexual o afectiva que han de-cidido mantener con sus parejas. Mediante esta clasifica-ción, se le niega la posibilidad de adoptar al hijo de su pareja a las personas que no coincidan con el modelo de familia ideado según los roles de género tradicionales.
En nuestro ordenamiento se consideran sospechosas y se presumen inconstitucionales las clasificaciones basadas en sexo, nacimiento, origen o condición social, raza, color, ideas políticas e ideas religiosas. Esto se debe a que nues-tra Constitución prohíbe expresamente el discrimen por cualquiera de esos motivos.(7) Para interpretar lo que sig-nifica discrimen por razón de sexo, se deben estudiar las maneras en que históricamente se ha tratado de forma desigual a las personas de distintos sexos, así como las motivaciones y las supuestas justificaciones que se han manifestado para ese trato desigual. Al hacer ese análisis, resulta evidente que las personas que han sido discrimina-das por razón de su sexo no se ajustan a las categorías sexuales establecidas tradicional y culturalmente. Es por ello que podemos señalar que el discrimen por sexo va de la mano con el discrimen por género; esto es, que se discri-mina contra aquellas personas que no cumplen con los roles de género asignados a su sexo, ya sea, por ejemplo, porque quieren trabajar en un área en la que típicamente no se desarrollan personas de su sexo, porque desean tener una apariencia física que no es la que se considera “normal” para su sexo, porque exhiben un comportamiento dis-tinto al que se ha enseñado que es el aceptable para cada *998 sexo, o porque toman decisiones sobre su vida, incluso su vida sexual, que no son las más acostumbradas en perso-nas de su sexo.(8) El discrimen por orientación sexual es una manifestación del discrimen por género, que es, a su vez, un componente del discrimen por razón de sexo.(9) Y estas tres modalidades de discrimen están prohibidas por nuestra Constitución.
Cuando se establece una clasificación sospechosa que viola nuestra prohibición del discrimen por razón de sexo —en este caso en su modalidad de discrimen por orienta-ción sexual — , procede aplicar un escrutinio estricto en la revisión de la constitucionalidad de la norma que se impugna. La disposición legal, entonces, se presume in-constitucional y el Estado tiene la obligación de probar que hay un interés apremiante detrás del trato desigual y que el discrimen es necesario, pues no existen medios menos onerosos para alcanzar ese interés apremiante.(10)
El interés apremiante que entrañan los artículos de nuestro Código Civil sobre adopción es promover el mejor bienestar de los menores adoptados. ¿Cómo un trato des-igual por motivo del sexo de las personas adoptantes ade-lanta ese interés? El Estado alega que lo hace al proteger los valores arraigados en la institución de la familia tradi-cional constituida por un hombre y una mujer casados en-tre sí junto a sus hijos. Esta aseveración es insostenible ante la gran diversidad de familias que componen nuestra sociedad, en las cuales se desarrollan plenamente muchas personas de bien. Aparte de ello, ¿es realmente necesario *999 este discrimen para adelantar el mejor bienestar de los adoptados? Más aún, ¿es este discrimen por razón de sexo el único medio disponible para garantizar a los niños y las niñas un hogar estable para crecer y propicio para desarro-llarse? Me parece claro que no. Nuestra política pública demuestra que lo verdaderamente importante al conside-rar si un menor debe ser adoptado por una persona es el cuidado y el amor que ésta le pueda brindar para su mejor bienestar. En ese análisis, la clave no debe ser el sexo de la persona o sus preferencias sexuales, sino los estudios so-ciales y psicológicos que indiquen que la persona está ca-pacitada para ser madre o padre de ese menor, como suce-dió en el presente caso. La alegación no fundamentada del Estado sobre la idoneidad de utilizar la existencia de una familia tradicional como criterio de evaluación no justifica el discrimen por razón de sexo al que están sometiendo a la peticionaria y otras personas en su misma posición.
Siendo así, el Estado no cumplió con su carga probatoria y procedía que declaráramos la inconstitucionalidad de la disposición impugnada. A pesar de esto, la mayoría utilizó un método de interpretación erróneo que produjo una res-puesta igualmente equivocada. No puedo avalar ese resultado.
III
Nuestra sociedad está compuesta por seres vivos en constante evolución. Por eso, la ley principal que regula las relaciones de las personas que viven en sociedad no puede congelarse en el tiempo. Nuestra Constitución es una guía para “promover el bienestar general y asegurar para noso-tros y nuestra posteridad el goce cabal de los derechos hu-manos”(11) y es obligación de los componentes de este Tri *1000 bunal interpretarla con ese fin.(12) Con una visión estática de la Constitución no podemos cumplir con esa obligación. Pensar que la Legislatura ya ha dado todas las respuestas a las controversias novedosas que se nos presentan con el pasar de los años es ignorar el rol de la judicatura en nues-tro sistema democrático y en una sociedad pluralista que está en continuo desarrollo y transformación. Nuestra fun-ción como los últimos intérpretes de nuestro Derecho es proveer soluciones justas a los casos particulares que atendemos. Al negarle a una menor las protecciones lega-les que merece para vivir una vida digna junto a sus dos madres, nos convertimos en un obstáculo en lugar de una herramienta de justicia.
*1001 — o

 “En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstítucionalidad por sub-inclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos... La regla es consustancial con el principio de que el Poder Judicial • — en abono de una deferencia hacia el Poder Legislativo— debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su ope-ración, a diferencia de éste, sin embargo, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la extensión de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del esta-tuto, queda así en vigor y se supera el discrimen”. (Enfasis suprimido). Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 618-619 (1981).

 31 L.P.R.A. secs. 531-539. Véase la discusión al respecto en la Opinión disi-dente del Juez Asociado Señor Estrella Martínez, págs. 1076-1079.

 Esa fue la premisa bajo la cual decidimos Ex parte J.A.A., 104 D.P.R. 551 (1976). En esa ocasión, enfatizamos que era necesario “buscar la intención legislativa y enmarcar nuestra decisión acorde a los principios generales que la inspiran”, con-siderando que nuestra institución de adopción “[e]stá basada en legislación de avan- *996 zada, con la cual ha de andar a la par la jurisprudencia de este Tribunal”. Id., pág. 556.

 Véanse las descripciones sobre esta figura en la Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 1023-1028, y la Opinión disidente del Juez Asociado Señor Estrella Martínez, págs. 1089-1095.

 31 L.P.R.A. secs. 538 y 539.

 Art. II, Sec. 1, Const. P.R., L.P.R.A., Tomo 1. El discrimen por razón de sexo no está prohibido expresamente en la Constitución de Estados Unidos.

 Véase la discusión sobre el discrimen por razón de sexo y género basado en estereotipos sobre las características que deben exhibir las féminas y sobre el discri-men por orientación sexual en relación con los principios de dignidad humana y libre desarrollo de la personalidad presentada en la Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 1042-1046 y 1046-1048.

 Así lo concluyó la Comisión Judicial Especial para Investigar el Discrimen por Razón de Género en los Tribunales de Puerto Rico en su informe El discrimen por razón de género en los tribunales de Puerto Rico, agosto 1995, págs. 24-25.

 Coincido con el análisis constitucional que se presenta con más detalle en la Opinión disidente del Juez Presidente Señor Hernández Denton, págs. 975-983.

 Preámbulo de la Constitución, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 266.

 La labor de un Tribunal Supremo requiere emplear diversas herramientas de interpretación. Algunos han llamado “activismo judicial” ese trabajo con el propó-sito de desacreditar posturas, metodologías o resultados que no les agradan. Ese “activismo”, presente tanto en decisiones que se tildan de liberales como en aquellas que se denominan conservadoras, no es sinónimo de incorrección o de extralimita-ción, sino que es parte del proceso de revisión judicial que se espera que lleven a cabo las juezas y los jueces llamados a velar por los valores que protege una constitución democrática. E. Chemerinsky, The Price of Asking the Wrong Question: An Essay on Constitutional Scholarship and Judicial Review, 62 Tex. L. Rev. 1207 (1984). Véanse, también: G.R. Stone, Citizens United and Conservative Judicial Activism, 2012 U. Ill. L. Rev. 485 (2012); E. Chemerinsky, Supreme Court-October Term 2009 Foreword: Conservative Judicial Activism, 44 Loy. L.A. L. Rev. 863 (2011); S. Moynihan, The Case for Constitutional Evolution: Rebutting Conservative Complaints of Judicial Activism in “The Imperial Judiciary: Why the Right Is Wrong About the Courts”, 81 Denv. U.L. Rev. 191 (2003); F.H. Easterbrook, Do Liberals and Conservatives Differ in Judicial Activism?, 73 U. Colo. L. Rev. 1401 (2002); W.R Marshall, Conservatives and the Seven Sins of Judicial Activism, 73 U. Colo. L. Rev. 1217 (2002); G. Lawson, Conservative or Constitutionalist?, 1 Geo. J.L. & Pub. Pol’y 81 (2002).