EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Oficina del Comisionado de Seguros de Puerto Rico<br><br>Recurrida<br><br>v.<br><br>Point Guard Insurance Company, Inc.<br><br>Peticionaria | Certiorari<br><br>2020 TSPR 149<br><br>205 DPR \_\_\_\_\_ |

Número del Caso:  CC-2019-0479


Fecha:  4 de diciembre de 2020


Tribunal de Apelaciones:

    Circuito Regional I de San Juan-Caguas


Abogados de la parte peticionaria:


    Lcdo. Juan J. Casillas Ayala
    Lcda. Ericka Celeste Montull Novoa


Abogados de la parte recurrida:

    Lcdo. Antonio Quiñones Rivera
    Lcdo. Brenda N. Perez Fernandez




Materia:  Derecho Constitucional - Libertad de expresión en foros públicos, Oficina del Comisionado de Seguros, gestiones de mercadeo de las aseguradoras




Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina del Comisionado de
Seguros de Puerto Rico

    Recurrida

                           CC-2019-479    *Certiorari*

           v.

Point Guard Insurance Company,
Inc.

    Peticionaria

Opinión del Tribunal emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 4 de diciembre de 2020.

En el presente caso -- uno que evaluaremos en el contexto del derecho a la libertad de expresión de una persona jurídica -- nos corresponde determinar si el Tribunal de Apelaciones erró al confirmar cierta *Resolución* emitida por la Oficina del Comisionado de Seguros. Mediante esta última, a su vez, se confirmó determinada *Orden* de cese y desista y la imposición de una multa administrativa a Point Guard Insurance Company tras concluir que ésta actuó en contravención de la Ley de Seguro de Responsabilidad Obligatorio de Vehículos de Motor, *infra*; ello al alegadamente haber incurrido en una de las conductas anticompetitivas en el proceso de selección del seguro de responsabilidad obligatorio.

En específico, se plantea aquí que la referida compañía aseguradora intervino indebidamente en dicho proceso al repartir material promocional sobre el seguro que ofrece, en los **"predios de una entidad autorizada"** para el cobro del mismo. Así pues, nos vemos en la obligación de expresarnos en cuanto al alcance del concepto "predios de una entidad autorizada", según estatuido en la precitada ley.

Adelantamos que, luego de un ponderado y cuidadoso análisis de los hechos ante nuestra consideración, así como del derecho aplicable a los mismos, Point Guard Insurance Company realizó un ejercicio válido de su derecho a la libertad de expresión que no debió ser sancionado. Veamos.

I.

Point Guard Insurance Company, Inc. (en adelante, "Point Guard") es una aseguradora autorizada por la Oficina del Comisionado de Seguros para suscribir negocios de seguros en Puerto Rico. Esta corporación ofrece el seguro de responsabilidad obligatorio, según el mismo se define en la Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor, *infra* (en adelante, "Ley de Seguro de Responsabilidad Obligatorio"). Por su parte, el Comisionado de Seguros es el encargado de administrar el Código de Seguros de Puerto Rico así como el funcionario responsable de velar por el cumplimiento con la precitada ley.

El 19 de mayo de 2017, el señor Fortunato Colón Parrilla (en adelante, "señor Colón Parrilla") -- agente

investigador de la División de Conducta de Mercado de la Oficina del Comisionado de Seguros -- observó que, cerca de la puerta de la Colecturía de Rentas Internas del Departamento de Hacienda ubicada en el Edificio Capital Center en Hato Rey (en adelante, "la Colecturía"), se encontraba una persona que repartía folletos promocionales sobre determinado seguro que ofrecía Point Guard.[1] Así las cosas, y ante lo que éste consideró una conducta ilegal, el señor Colón Parrilla  tomó varias fotos como evidencia de lo allí observado y anotó en el material promocional la fecha, hora y lugar en que recibió el mismo.

Por los hechos anteriores, el 2 de febrero de 2018 el entonces Comisionado de Seguros, señor Javier Rivera Ríos, dictó una *Orden* en contra de Point Guard en la cual concluyó que la referida aseguradora intervino indebidamente en el proceso de selección de los asegurados del seguro de responsabilidad obligatorio, incurriendo así en una de las conductas anticompetitivas prohibidas por el Artículo 9 de la Ley de Seguro de Responsabilidad Obligatorio, *infra*, y las cartas normativas adoptadas en virtud de ésta. Lo anterior, pues conforme a lo observado por el señor Colón Parrilla, el Comisionado de Seguros razonó que Point Guard exhibió su nombre y logo y repartió folletos promocionales de su seguro en los predios de la

---

[1] "La Colecturía de Rentas Internas del Departamento de Hacienda ubicada en el Edificio Capital Center, número 239 de la Avda. Hostos, Hato Rey, Puerto Rico, es una entidad autorizada para el cobro del SRO. (Hecho Estipulado Núm. 3)". Apéndice de *certiorari,* pág. 32.

Colecturía -- entidad autorizada para el cobro del seguro de responsabilidad obligatorio -- incitando así al público consumidor a obtener el seguro ofrecido por la referida corporación.

Consecuentemente, y sin notificación previa, el Comisionado de Seguros ordenó a Point Guard cesar y desistir de la práctica antes señalada y le impuso una multa administrativa de veinticinco mil dólares ($25,000). Además, se le apercibió que podía solicitar una vista administrativa y, de así hacerlo, la multa quedaría sin efecto alguno pero la orden de cese y desista permanecería. De no solicitar vista, se le advirtió a Point Guard que renunciaba a su derecho a ser oído por lo que la *Orden* advendría final y firme.

Insatisfecha con la referida *Orden*, Point Guard presentó una *Impugnación de orden y/o solicitud fundamentada para la celebración de vista*. Allí, sostuvo que la investigación realizada por la Oficina del Comisionado de Seguros era incompleta pues no se identificó a la persona que estaba repartiendo las promociones a nombre de Point Guard. Asimismo, alegó que dicha Oficina carecía de evidencia que demostrara que ésta intervino indebidamente en el proceso de selección de los asegurados.

En atención al petitorio de la referida aseguradora, la Oficina del Comisionado de Seguros señaló la celebración de una vista administrativa. En la misma, dicha dependencia gubernamental presentó el testimonio del señor Colón

Parrilla, así como tres (3) fotos a color y material promocional de la aseguradora.

En lo pertinente a la controversia que nos ocupa, el señor Colón Parrilla testificó que la persona a la cual vio entregando el material de Point Guard en la Colecturía de Rentas Internas, ubicada en el Edificio Capital Center en Hato Rey, estaba frente a la puerta de la Colecturía, en la acera pública. Así, definió esta última como un área de libre acceso y sin restricción alguna al público.

Finalizado el desfile de prueba, Point Guard presentó una moción de *non suit* por entender que dicha agencia gubernamental no contaba con evidencia suficiente que sustentara la alegada violación. Además, esbozó varios señalamientos de error conforme a los cuales solicitó que se dejara sin efecto la *Orden* dictada.

En primer lugar, la referida aseguradora arguyó que la manera en que el Comisionado de Seguros condujo el proceso que dio lugar a la *Orden* la colocó en un estado de indefensión total -- pues este último no efectuó una investigación suficiente -- ya que sólo realizó una inspección de campo y no corroboró la identidad de la persona que entregaba el material promocional el día de los hechos. Asimismo, Point Guard adujo que el Comisionado de Seguros incurrió en una violación a su debido proceso de ley, pues ésta advino en conocimiento del proceso que dio lugar a la imposición de la multa varios meses después de

ocurridos los hechos, entiéndase a través de la *Orden* dictada el 2 de febrero de 2018.

Por otra parte, Point Guard planteó que, conforme al testimonio del investigador, así como las fotos presentadas en evidencia, la persona que estaba entregando el material promocional se encontraba en una acera pública -- la cual constituía un bien de uso público -- por lo que no se configuró una conducta anticompetitiva conforme prohíbe la Ley de Seguro de Responsabilidad Obligatorio, *infra*. Ello, pues la precitada ley sólo prohibía las gestiones de mercadeo o promoción dentro de los predios de las entidades autorizadas para el cobro del seguro de responsabilidad obligatorio y el lugar donde se encontraba dicha persona no podía considerarse como "predio". Igualmente, sostuvo que el testimonio del señor Colón Parrilla demostró serias contradicciones y falta de conocimiento sobre la Ley de Seguro de Responsabilidad Obligatorio, *infra*, pero que, aun así, este último testificó que la persona se encontraba en la acera pública, que se podía caminar por ella libremente y que no había portones ni barreras.

Por todo lo anterior, la mencionada aseguradora indicó que el récord estaba huérfano de evidencia contundente que demostrara que ésta intervino indebidamente en el proceso de selección del seguro de responsabilidad obligatorio. Habiendo el testigo admitido que la persona se encontraba en la acera pública, Point Guard argumentó que no existía

fundamento alguno que validara la *Orden* y, por ende, no procedía la multa administrativa impuesta.

Aquilatada la prueba documental y testifical, el Comisionado de Seguros realizó las siguientes determinaciones de hechos:

1. […]

4. El 19 de mayo de 2017, el señor Colón Parrilla se dirigió a la Colecturía de Rentas Internas del Departamento de Hacienda ubicada en el Edificio Capital Center, en adelante "la EA", donde observó a una persona, en adelante "la Persona", con camisa y gorra con logo del Asegurador, repartiendo material promocional del SRO del Asegurador a las personas que entraban a la EA, incluyendo al señor Colón Parrilla.

**5. El señor Colón Parrilla observó a la Persona en una columna de la estructura de la EA y frente a una de las puertas de la EA, entendiendo este que la Persona estaba ubicada en la acera pública, en la acera o en parte del edificio de la EA y que acera y acera pública no es lo mismo. El señor Colón Parrilla no vio a la Persona dentro de la EA.**

6. El señor Colón Parrilla tomó tres (3) fotos a la Persona, de distintos ángulos; y anotó en el material promocional recibido, la hora, fecha y lugar.

7. El señor Colón Parrilla desconoce el nombre de la Persona; qué relación tiene con el Asegurador, si alguna; o si tiene relación con otra entidad o con algún competidor del Asegurador.

8. El señor Colón Parrilla no identificó a la Persona, ni hizo gestiones con el Asegurador, en fecha contemporánea a los hechos, porque no fue importante para él hacerlo; ni hizo gestiones para saber qué relación tenía con el Asegurador, si alguna. Infirió que, por la camisa y gorra utilizada, así como por el material que repartía, debía tener algún tipo de relación con el Asegurador.

9. El señor Colón Parrilla, que indicó no haber intervenido previamente con algún asegurador

promocionando su SRO en una acera pública, no hizo una evaluación de lo que constituye acera, ni estudio sobre si el área donde observó a la persona era parte de la acera.

**10. La ubicación donde se encontraba la Persona era de libre acceso y sin restricción alguna al público.**

11. El señor Colón Parrilla ha recibido adiestramientos y ha tenido reuniones con su supervisor, sobre la Ley y las cartas normativas emitidas a su amparo, pero no ha recibido adiestramiento sobre la enmienda a la Ley relacionada a las gestiones de promoción en aceras y vías públicas. Apéndice de *certiorari*, págs. 32-33.

Así las cosas, y luego de evaluar los argumentos esbozados por las partes y la normativa aplicable, el 15 de octubre de 2018 la Oficina del Comisionado de Seguros dictó la *Resolución* recurrida. En ella, concluyó que, cónsono con sus poderes y mecanismos de investigación, la referida agencia gubernamental efectuó la investigación que entendió necesaria, utilizando el medio que estimó conveniente -- entiéndase, una inspección de campo -- a raíz de lo cual emitió la mencionada *Orden*. Expresó que la misma se consideraba el informe que contiene el resultado de la investigación pues notificó los cargos en contra de la aseguradora. Asimismo, razonó que le concedió a Point Guard una adjudicación imparcial, la oportunidad de presentar prueba en una vista, a confrontar la prueba presentada en su contra y a que la decisión estuviera basada exclusivamente en el expediente, por lo que se le garantizó el debido proceso de ley.

En cuanto al argumento de la ubicación de la persona que estaba entregando el material promocional, el Comisionado de Seguros entendió que, del testimonio del señor Colón Parrilla -- el cual reconoció como contradictorio -- así como de una revisión de las fotos presentadas en evidencia, se desprende que estaba justo frente a la puerta de la Colecturía, ubicándose en el área comunal del edificio y no en la acera pública. En consecuencia, concluyó que la aseguradora exhibió su nombre y logo y repartió folletos promocionales de su seguro en los predios de una entidad autorizada para el cobro del seguro de responsabilidad obligatorio, interviniendo así con el proceso de selección de los asegurados, lo cual -- a su entender -- constituyó una violación al Artículo 9 de la Ley de Seguro de Responsabilidad Obligatorio, *infra*, y las cartas normativas, *infra*. Ante ello, declaró no ha lugar la moción de *non suit* y confirmó la *Orden* de cese y desista así como la multa impuesta. Además, le apercibió a la aseguradora respecto a su derecho a solicitar reconsideración o, en la alternativa, a presentar un recurso de revisión judicial.

Inconforme con la determinación del Comisionado de Seguros, Point Guard presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. En el mismo, adujo que el referido funcionario gubernamental erró al confirmar la multa administrativa impuesta ya que la persona que se encontraba repartiendo material promocional

se encontraba en la acera pública según permite la Ley de Seguro de Responsabilidad Obligatorio, *infra*, y las cartas normativas, *infra*. Como segundo señalamiento de error, arguyó que el Comisionado de Seguros erró al confirmar una multa que le fue impuesta sin realizarse una investigación a los fines de conocer si en efecto la persona repartiendo el material era empleado de Point Guard.

Evaluados los alegatos de ambas partes, el 25 de abril de 2019 el Tribunal de Apelaciones emitió una *Sentencia* mediante la cual confirmó la *Resolución* de la agencia.[2] El foro apelativo intermedio entendió que, aunque el acceso a la entrada de la Colecturía es libre, la misma formaba parte de los predios de ésta ya que ello no se limitaba al área interior.

Por otro lado, y en cuanto al segundo argumento de Point Guard, el tribunal *a quo* razonó que el poder de la agencia para investigar como también los mecanismos a utilizar son amplios, entre los cuales se encuentran las investigaciones de campo, mecanismo que utilizó la Oficina del Comisionado de Seguros en el presente caso. Asimismo, sostuvo que no le correspondía a la agencia administrativa corroborar la identidad de la persona que realizaba la promoción de Point Guard pues la norma prohibitiva era

---

[2] El Panel del Tribunal de Apelaciones que atendió el recurso estuvo compuesto por la Juez Ortiz Flores y los Jueces Rodríguez Casillas y Salgado Schwarz. El Juez Salgado Schwarz emitió una opinión disidente en la cual concluyó que la Oficina del Comisionado de Seguros abusó de su discreción al determinar que Point Guard incurrió en una conducta anticompetitiva conforme se prohíbe en la Ley de Seguro de Responsabilidad Obligatorio, *supra*.

clara al expresar que dicha conducta no se permitiría a ningún asegurador participante, ni a sus agentes, gestores o persona alguna en los predios de las colecturías. Para el foro apelativo intermedio, la identificación de esta persona mediante el uso de una gorra y camiseta con el logo de la aseguradora, así como los folletos promocionales, fue suficiente para determinar que actuaba en representación de Point Guard.

Aún en desacuerdo, Point Guard acude ante nos mediante petición de *certiorari*. En síntesis, ésta plantea los mismos señalamientos de error que esbozó ante el Tribunal de Apelaciones. Oportunamente, el Comisionado de Seguros presentó su alegato en oposición.

Trabada así la controversia, expedido el recurso el 25 de octubre de 2019 y con el beneficio de la comparecencia de ambas partes en el litigio, procedemos a exponer la normativa aplicable a la misma.

II.

De entrada, precisa aclarar que en la ley aquí en controversia, entiéndase la Ley de Seguro de Responsabilidad Obligatorio, según enmendada, *infra*, se excluyeron las calles y aceras públicas de la prohibición a las gestiones de mercadeo de las aseguradoras. Por ello, y ante la ausencia de definición del concepto "predio de una entidad autorizada" -- lo cual ha provocado la aplicación arbitraria de la prohibición contenida en la precitada ley, tanto por la Oficina del Comisionado de Seguros como por el

Tribunal de Apelaciones -- nos vemos en la obligación de aclarar ciertos aspectos de índole constitucional en cuanto al derecho a la libertad de expresión y la doctrina de los foros públicos.[3]

Como es sabido, el Artículo II, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho fundamental de los ciudadanos a la libertad de expresión como uno de los valores de más alta jerarquía constitucional, al disponer que "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". Const. ELA

---

[3] La amplitud con la que se ha definido el concepto "predio" ha sido avalada por el Tribunal de Apelaciones no solo en el caso que nos ocupa, sino en otras tres ocasiones. Véanse, *Comisionado de Seguros de Puerto Rico v. Cooperativa de Seguros Múltiples*, 2016 WL 8376499 (concluyendo que el concepto predio es la totalidad del inmueble y no el área que comienza desde la puerta de entrada hacia el interior) ; *Comisionado de Seguros de Puerto Rico v. Integrand Assurance Company*, 2017 WL 3881776 (confirmando la determinación de la OCS tras razonar que las cartas normativas son claras al prohibir las gestiones de mercadeo en la totalidad de los predios de la entidad autorizada); *Comisionado de Seguros v. Point Guard Insurance Company*, 2017 WL 6887322 (confirmando la multa impuesta por la OCS tras concluir que las gestiones de mercadeo están prohibidas en todos los predios de la Colecturía).

En particular, en el primero de estos tres casos, el foro apelativo intermedio expresó:

> "[e]l usual significado de la palabra "predio" es cónsono con la primera acepción contenida en el Diccionario de la Real Academia Española. A saber: "Heredad, hacienda, tierra o posesión inmueble". Por tanto, el planteamiento de la CSM de que el predio de la Colecturía está comprendido por el área que comienza desde la puerta de entrada hacia el interior, no es cónsono con el usual significado que se le reconoce a la palabra predio en Puerto Rico". *Comisionado de Seguros de Puerto Rico v. Cooperativa de Seguros Múltiples*, *supra*.

> Así pues, lo anterior es un claro indicio de que se trata de una controversia recurrente por lo que estamos obligados a expresarnos sobre la definición y el alcance del concepto "predios de una entidad autorizada".

art. II, § 4, LPRA, Tomo 1. Véase, *ELA v. Northwestern Selecta*, 185 DPR 40 (2012); *Vigoreaux Lorenzana* v. Quizno's, 173 DPR 254 (2008); *Muñiz v. Admor. Deporte Hípico*, 156 DPR 18 (2002). Nuestro ordenamiento jurídico extiende la protección que otorga dicha garantía tanto a personas naturales como a personas jurídicas. Véase, *Asoc. de Maestros v. Srio. de Educación*, 156 DPR 754 (2002); *Colegio de Abogados v. Schneider*, 112 DPR 540 (1982) citando a *First National Bank of Boston v. Belloti*, 435 US 765 (1978). Véase además, *Citizens United v. Federal Election Com'n*, 558 US 310 (2010).

Así pues, el derecho a la libertad de expresión abarca "el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de esos derechos". *U.P.R. v. Laborde Torres*, 180 DPR 253, 286 (2010); *Muñiz v. Admor. Deporte Hípico*, *supra*, pág. 23 (citando a 4 Diario de Sesiones de la Convención Constituyente 2564 (1951)). Es por ello que la referida cláusula constitucional es raíz indiscutible de nuestro sistema democrático de gobierno y, como tal, los tribunales estamos llamados a la más cautelosa protección de ésta. *U.P.R. v. Laborde*, *supra*, págs. 286-87; *Vigoreaux Lorenzana v. Quizno's*, *supra*, pág. 260; *Asoc. de Maestros v. Srio. de Educación*, 156 DPR 754, 768 (2002); *Mari Brás v. Casañas*, 96 DPR 15, 20-21 (1968).

Ahora bien, la referida garantía constitucional no es un derecho absoluto pues puede subordinarse a otros intereses cuando la necesidad y conveniencia pública lo requieran. *U.P.R. v. Laborde*, *supra*; *Asoc. de Maestros v. Srio. de Educación*, *supra*, pág. 768; *Mari Brás v. Casañas*, *supra*. Por esa razón, hemos reiterado que el referido derecho está sujeto a la imposición de limitaciones, siempre y cuando las mismas sean interpretadas restrictivamente, de manera que no abarquen más de lo necesario. *U.P.R. v. Laborde Torres*, *supra*; *Muñiz v. Admor. Deporte Hípico*, *supra*, pág. 24; *Velázquez Pagán v. A.M.A.*, 131 DPR 568, 577 (1992).

En esa dirección, conviene recordar aquí que la precitada Sección 4 de nuestra Carta de Derechos tiene su origen en los postulados de la Primera Enmienda de la Constitución de Estados Unidos. Const. EE.UU. enm. I. Véase, *U.P.R. v. Laborde Torres*, *supra*, (citando a J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982, T. 3, pág. 181). Consecuentemente, hemos adoptado el análisis utilizado por la Corte Suprema de Estados Unidos al momento de atender controversias que involucren el derecho a la libertad de expresión, entiéndase, la distinción entre la reglamentación gubernamental del contenido de la expresión *vis a vis* la reglamentación gubernamental del tiempo, lugar y manera de la expresión. *Íd.* en la pág. 288; *Muñiz v. Admor. Deporte Hípico*, *supra*, (citando a R. Serrano Geyls, *Derecho*

*Constitucional de Estados Unidos y Puerto Rico*, San Juan. Ed. C. Abo. P.R., 1988, Vol. II, pág. 1278); *Asoc. de Maestros v. Srio. de Educación*, *supra*, pág. 769.

Respecto a esto último, y con el fin de alcanzar un balance entre el interés gubernamental y el derecho constitucional de los ciudadanos a expresarse, se ha instaurado un análisis tripartito en donde el grado de expresión permitido depende del tipo de foro dónde se realice. *U.P.R. v. Laborde Torres*, *supra*, pág. 291; *Asoc. de Maestros v. Srio. de Educación*, *supra*, pág. 771. De esa forma, se han reconocido tres foros de expresión, a saber: (1) el foro público tradicional; (2) el foro público por designación; y (3) el foro público no tradicional. *U.N.T.S. v. Srio. de Salud*, 133 DPR 153, 162-63 (1993); *Pacheco Fraticelli v. Cintrón Antosanti*, 122 DPR 229, 240-42 (1988). Véase, *Perry Ed. Assn. V. Perry Local Educators' Assn.*, 460 US 37 (1983).

Los foros públicos tradicionales son aquellos lugares que, por uso y costumbre, han sido dedicados a la reunión pacífica y el debate público tales como las calles, aceras y parques. *Coss v. U.P.R.*, 137 DPR 877, 887 (1995); *Caquías v. Asoc. Res. Mansiones de Río Piedras*, 134 DPR 181, 187 (1993). Véase, además, Artículo 256 del Código Civil, 31 LPRA sec. 1025. En este foro, el Gobierno no puede prohibir de manera absoluta el ejercicio de la libertad de palabra y es de libre acceso al público en general, ya que "por tiempo inmemorable se ha reservado para el uso del pueblo y

para la reunión entre ciudadanos con el fin de cultivar la comunicación y discutir asuntos de interés social". *Pacheco Fraticelli v. Cintrón Antosanti*, *supra*. Véase, además, *Watchtower Bible v. Mun. Dorado I*, 192 DPR 73, 135 (2014); *U.P.R. v. Laborde Torres*, *supra*, págs. 292-93.

En cuanto a lo anterior, la Corte Suprema federal ha expresado que "**[t]raditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression**". *United States v. Grace*, 461 US 171, 177 (1983). Véase, además, *Boos v. Barry*, 485 US 312 (1988). Así, en las calles, parques y aceras se ha permitido la expresión y, en cuanto a ellos, se ha aplicado el principio de que "[a]quel que está legítimamente en una calle que el Estado ha dejado abierta para el público lleva consigo allí así como en cualquier otro lugar el derecho constitucional a expresar sus puntos de vista de una manera ordenada". (Traducción suplida) *Flower v. US*, 407 US 197, 198-99 (1972); *Prince v. Massachusetts*, 321 US 158, 174 (1944); *Jamison v. Texas*, 318 US 413, 416 (1943). ("But one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion").

Así pues, y en lo relacionado a la controversia ante nuestra consideración, el máximo foro federal ha rechazado realizar una investigación fáctica particularizada para determinar si en efecto se trata de un foro público. En *United States v. Grace*, *supra*, correspondía expresarse en torno a la constitucionalidad de una ley que disponía "[i]t shall be unlawful to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." 40 USC ant. sec. 13k. En cuanto a lo que constituía *court grounds*, la referida ley expresaba que se extendía a las cuatro calles que formaban la cuadra donde se encontraba la Corte, lo cual no sólo incluía dicho edificio, la plaza y sus jardines, sino también las aceras. 40 USC ant. sec. 13p. **Allí, se resolvió que las aceras públicas que formaban el perímetro alrededor de la Corte Suprema de Estados Unidos no eran diferentes a cualquier otra acera pública, por lo que se consideraban foros públicos a los fines de la protección de la Primera Enmienda y, como consecuencia de ello, la referida disposición de ley fue declarada inconstitucional.** *United States v. Grace, supra,* **págs. 172 y 183-84.**

Más adelante, en *Boos v. Barry*, *supra*, la Corte Suprema Federal concluyó que las aceras circundantes a las embajadas de la Unión Soviética y de Nicaragua en Washington D.C., también eran foros públicos por lo que era

inconstitucional de su faz una prohibición absoluta a utilizar carteles o congregarse en repudio de los gobiernos extranjeros a menos de quinientos (500) pies de dichas embajadas. De forma similar, en *Frisby v. Schultz*, 487 US 474 (1988), se expresó que una calle pública no pierde su clasificación como foro público tradicional por el simple hecho de que pase a través de un vecindario o porque sea un espacio angosto. Consecuentemente, la Corte Suprema sentenció que "no particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Íd.* en la pág. 481.

Finalmente, y en lo pertinente al caso que nos ocupa, precisa señalar brevemente que la expresión comercial está sujeta a la protección de la precitada cláusula constitucional, aunque en un grado menor que otras categorías de expresión. *Vigoreaux Lorenzana v. Quizno's*, *supra*, pág. 270. Véase, además, *Bd. Of Trustees v. Fox*, *492 US 469* (1989); *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 US 557 (1980). Este tipo de expresión propone una transacción comercial y no sólo sirve al interés económico de quien la propone, sino que también ayuda al posible consumidor -- y por tanto adelanta el interés de la sociedad -- a tomar una decisión informada respecto al producto o servicio de que se trate. *City of Cincinnati v. Discovery Network, Inc.*, 507 US 410, 439 (1993); *Vigoreaux Lorenzana v. Quizno's*, *supra*, págs. 269-

70; *Central Hudson Gas & Electric Corp. v. Public Service Comm'n, supra; Ohralik v. Ohio State Bar*, 436 US 447, 456 (1978). Para que la expresión comercial esté protegida, la misma debe referirse a una actividad lícita y no ser engañosa. *Bd. Of Trustees v. Fox*, supra, págs. 475-80; *Central Hudson Gas & Electric Corp. v. Public Service Comm'n, supra*, págs. 564-66. De ser así, los tribunales debemos determinar si la reglamentación persigue un interés gubernamental sustancial; si dicha reglamentación está directamente relacionada con ese interés; y si la misma no es más abarcadora de lo necesario para alcanzarlo. *Bd. Of Trustees v. Fox*, supra; *Central Hudson Gas & Electric Corp. v. Public Service Comm'n, supra*, págs. 564-66.

III.

De otra parte, y por considerarlo en extremo pertinente para la correcta disposición de las controversias ante nuestra consideración, es menester señalar que con la aprobación de la Ley de Seguro de Responsabilidad Obligatorio, Ley Núm. 253-1995, 26 LPRA sec. 8051 *et seq.*, se adoptó en Puerto Rico un sistema de seguro de responsabilidad obligatorio para cubrir los daños ocasionados a los vehículos a causa de accidentes de tránsito. No obstante, con el fin de propiciar la creación de un ambiente de competencia sana y equitativa, en el que los consumidores pudieran seleccionar al asegurador de su preferencia, la precitada ley fue enmendada en el año 2014. Véase, Exposición de Motivos, Ley Núm. 246-2014.

Así pues, a través de la Ley Núm. 245-2014 se añadió el Artículo 9 a la Ley de Seguro de Responsabilidad Obligatorio, *supra*, el cual, en su versión original, disponía que:

Incurrirá en incumplimiento con esta Ley cualquier aseguradora, la Asociación de Suscripción Conjunta o entidad autorizada para el cobro del seguro de responsabilidad obligatorio que de cualquier manera intervenga indebidamente en el proceso de selección del asegurado con el fin de favorecer a una aseguradora sobre otra, incluyendo a la Asociación de Suscripción Conjunta, provea información falsa sobre otro asegurador o sobre el proceso de selección, haga la selección por el asegurado o lleve a cabo cualquier otra acción que tenga como efecto intervenir indebidamente en el proceso de libre selección del asegurado en cuanto a su proveedor del seguro de responsabilidad obligatorio. Lo anterior no excluye que las aseguradoras y la Asociación de Suscripción Conjunta o cualquier representante de éstas, lleve a cabo gestiones de promoción y mercadeo relacionados a la venta del seguro obligatorio. 26 LPRA ant. sec. 8057a.

De conformidad con lo anterior, el 21 de mayo de 2015 la Oficina del Comisionado de Seguros promulgó la Carta Normativa Núm. CN-2015-189-LR respecto a los procedimientos de selección del seguro y la implementación de la Ley Núm. 245-2014, dirigida a todas las entidades autorizadas para el cobro del seguro obligatorio y aseguradoras participantes. En la parte V, inciso G del referido documento, se establecía que entre una de las prácticas prohibidas durante el proceso de selección se encontraba el que una aseguradora procurara que la entidad autorizada para el cobro del seguro publicara, divulgara o entregara directa o indirectamente información o material

publicitario, o que intentara influenciar a los consumidores en la selección de un asegurador en particular. Sin embargo, más adelante se aclaró que ello no excluía que las aseguradoras llevaran a cabo gestiones de promoción o mercadeo fuera de las facilidades y la totalidad de los predios de una entidad autorizada.

Posteriormente, el Artículo 9 de la Ley del Seguro de Responsabilidad Obligatorio, *supra*, fue enmendado mediante la Ley Núm. 201-2015 para que rezara de la siguiente manera:

> Artículo 9. – Conductas anticompetitivas, procedimientos y penalidades.
>
> (a) Conductas anticompetitivas: Constituirá una conducta anticompetitiva en el mercado del seguro de responsabilidad obligatorio cuando un asegurador participante del "Formulario de Selección", incluyendo la Asociación de Suscripción Conjunta, incurra en alguna de las siguientes actuaciones:
>
> (i)…
>
> (v) Hacer gestiones de mercadeo, colocar publicidad, entregar o colocar promoción relacionada con un producto de seguro de responsabilidad obligatorio una aseguradora participante del "Formulario de Selección", incluyendo la Asociación de Suscripción Conjunta, dentro de los predios de una entidad autorizada para el cobro del seguro de responsabilidad obligatorio o promover que se coloque dicha publicidad o promoción. **Esta prohibición no impide que las aseguradoras lleven a cabo publicidad, promociones o gestiones de mercadeo fuera de los predios de la entidad autorizada para el cobro del seguro de responsabilidad obligatorio o en la vía y aceras públicas**… (Énfasis suplido) 26 LPRA sec. 8057a.

En respuesta a la referida enmienda, la Oficina del Comisionado de Seguros, el Departamento de Hacienda y el

Departamento de Transportación y Obras Públicas emitieron, en conjunto, la Carta Normativa Núm. CN-2016-212-AL, donde se reafirmó que no se permitiría a ningún asegurador, ni sus agentes gestores o persona alguna llevar a cabo dentro de las facilidades y predios de las Colecturías de Rentas Internas gestiones de promoción, mercadeo, solicitación y ventas relacionadas con el seguro de responsabilidad obligatorio. De igual forma, aclararon que la anterior prohibición no impide que dichas actividades se lleven a cabo fuera de los predios de la entidad autorizada o en la vía y aceras públicas.

En esa dirección, cabe mencionar que, según establecido en la precitada ley, aquella aseguradora que incurra en alguna de las conductas identificadas como anticompetitivas -- ya sea que ello se haya determinado mediante un procedimiento de vista administrativa o mediante proceso de investigación -- será sancionada por el Comisionado de Seguros con una multa administrativa no menor de veinticinco mil dólares ($25,000.00) por actuación. 26 LPRA sec. 8057a(c)(1).

IV.

Establecido lo anterior, resulta indispensable pormenorizar lo relativo al alcance de la revisión judicial de las determinaciones de las agencias administrativas. A esos fines, la Ley de Procedimiento Administrativo Uniforme (en adelante, "LPAU"), 3 LPRA sec. 9601 *et seq.*, provee para que una parte adversamente afectada por una orden o

resolución final de una agencia, que haya agotado todos los remedios provistos por ésta o por el organismo administrativo apelativo correspondiente, pueda presentar una solicitud de revisión ante el Tribunal de Apelaciones dentro de un término de treinta (30) días contados a partir de la notificación de la orden o resolución recurrida. Sec. 4.2 de la LPAU, 3 LPRA sec. 9672.

No empece ello, en nuestro ordenamiento jurídico es norma firmemente establecida que los tribunales apelativos han de conceder gran deferencia a las decisiones de los organismos administrativos. *Asoc. FCIAS v. Caribe Specialty II*, 179 DPR 923, 940 (2010); *Martínez Segarra v. Rosado Santoni*, 165 DPR 582, 589 (2005); *Otero v. Toyota*, 163 DPR 716, 727 (2005); *Pacheco v. Estancias*, 160 DPR 409, 431 (2003). Esto último debido a que dichas agencias cuentan con el conocimiento especializado y la pericia sobre los aspectos que les han sido delegados por ley. *Batista de Nobbe v. JTA. Directores*, 185 DPR 206, 215 (2012); *Hatillo Cash & Carry v. A.R.Pe*, 173 DPR 934, 959-60 (2008); Maldonado *v. Junta de* Planificación, 171 DPR 46, 71 (2007). Por ello, hemos expresado que las determinaciones de hechos de las agencias tienen una presunción de legalidad y corrección, por lo que la revisión judicial se circunscribe a dilucidar si la actuación de la agencia es ilegal, arbitraria o irrazonable. *Rebollo v. Yiyi Motors*, 161 DPR 69, 76 (2004); *Mun. de San Juan v. J.C.A.* 152 DPR 673, 688-

89 (2000); *Fuertes y otros v. A.R.Pe,* 134 DPR 947, 953 (1993).

En ese sentido, la sección 4.5 de la LPAU dispone que las determinaciones de hechos de las agencias serán sostenidas por el tribunal revisor si se basan en evidencia sustancial que obre en el expediente administrativo. 3 LPRA sec. 9675. Evidencia sustancial se ha definido como "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Batista de Nobbe v. JTA. Directores,* supra, pág. 216; *Empresas Ferrer v. A.R.Pe,* 172 DPR 254, 266 (2007); *Otero v. Toyota,* supra, pág. 728. Es decir, a manera de excepción los tribunales pueden intervenir con las determinaciones de hechos de una agencia cuando no están sustentadas por el expediente, ya que el foro judicial no debe sustituir su criterio por el del foro administrativo si éste hizo una interpretación razonable de los hechos. *Batista de Nobbe v. JTA Directores,* supra; *Hernández, Álvarez v. Centro* Unido, 168 DPR 592, 615-16 (2006); Otero *v. Toyota,* supra, pág. 728.

No obstante, la precitada sección también establece que las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal. 3 LPRA sec. 9675. De esta forma, los foros judiciales podrán sustituir el criterio de la agencia por el suyo solo cuando no encuentran una base racional para explicar la decisión administrativa. Es decir, no tenemos libertad absoluta para descartar

libremente las conclusiones de la agencia. *Empresas Ferrer v. A.R.Pe*, *supra*, pág. 266; *P.C.M.E. v. J.C.A*, 166 DPR 599, 616-17 (2005); *Otero v. Toyota*, *supra*, pág. 729.

En síntesis, la mencionada doctrina de la deferencia cede cuando la actuación administrativa es irrazonable o ilegal y ante interpretaciones administrativas que conducen a injusticias. *Asoc. FCIAS v. Caribe Specialty II*, *supra*, págs. 941-42; *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 DPR 70, 76 (2000); *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 DPR 750, 761 (1999). Aun cuando se reconoce que la interpretación realizada por una agencia respecto a la ley que administra y custodia merece gran deferencia, esto último cede cuando dicha interpretación produce resultados incompatibles o contrarios al propósito del estatuto interpretado y a su política pública. *Asoc. FCIAS v. Caribe Specialty II*, *supra*; *Martínez Segarra v. Rosado Santoni*, supra; *Pacheco v. Estancias*, *supra*, pág. 433; *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, *supra*, pág. 75. En el descargue de nuestra función revisora, los tribunales apelativos debemos "distinguir entre cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y cuestiones propias de la discreción o pericia administrativa". *Rebollo v. Yiyi Motors*, *supra*, pág. 78; *Reyes Salcedo v. Policía de Puerto Rico*, 143 DPR 85, 97 (1997); *Adorno Quiles v. Hernández*, 126 DPR 191, 195 (1990).

V.

Delimitado el alcance de la revisión judicial, resulta menester estudiar con detenimiento las normas de hermenéutica que los tribunales estamos llamados a aplicar en el ejercicio de nuestra función adjudicativa. Como principio cardinal de hermenéutica, el Artículo 14 del Código Civil establece que "cuando la ley es clara [y] libre de toda ambigüedad, su letra no debe ser menospreciada bajo el pretexto de cumplir con su espíritu". 31 LPRA sec. 14. Por consiguiente, el primer paso al interpretar una ley es remitirnos al propio texto de ésta, ya que cuando el legislador se ha expresado en un lenguaje claro e inequívoco, dicho texto es la expresión por excelencia de la intención legislativa. *Rosa Molina v. ELA*, 195 DPR 581 (2016); *Cordero et al. v. A.R.Pe et al.*, 187 DPR 445, 456 (2012); *Soc. Asist. Leg. v. Ciencias Forenses*, 179 D.P.R. 849, 862 (2010); *CBS Outdoor v. Billboard One, Inc. et al.*, 179 D.P.R. 391, 417 (2010). Es decir, no es necesario indagar más allá de la ley para cumplir con su propósito legislativo a menos que su texto no sea claro. *San Gerónimo Caribe Project v. Registradora,* 189 DPR 849, 866 (2013); *Cordero et al. v. A.R.Pe et al.*, *supra*, pág. 456; *Asoc. FCIAS v. Caribe Specialty II*, *supra*, pág. 938. "En esos menesteres, debemos interpretar la ley en su conjunto, y no por secciones separadas". *Rosado Molina v. ELA*, *supra*, pág. 590. Así pues, estamos obligados a armonizar, en la medida de lo posible, todas las disposiciones de la ley, en aras de obtener un resultado

más sensato, lógico y razonable. *San Gerónimo Caribe Project v. Registradora*, *supra*, pág. 869; *Asoc. FCIAS v. Caribe Specialty II*, *supra*, pág. 940; *Sucn. Álvarez Crespo v. Pierluisi*, 150 DPR 252, 276 (2000).

En lo que respecta al presente caso, es principio de hermenéutica constitucional que, al analizar las leyes, los tribunales nos esforcemos por lograr una interpretación cónsona con el mantenimiento de la constitucionalidad de las mismas. *Rexach v. Ramírez Vélez*, 162 DPR 149 (2004); *Nogueras v. Hernández Colón (I)*, 127 DPR 405, 412 (1990); *Milán Rodríguez v.* Muñoz, 110 DPR 610, 618 (1981). De esta forma, en nuestra jurisdicción los planteamientos constitucionales no deben abordarse cuando un caso pueda resolverse mediante una de las siguientes maneras: (1) mediante un análisis estatutario válido; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una interpretación razonable de la legislación que permita soslayar la cuestión constitucional; y (4) porque la controversia puede quedar resuelta definitivamente por otros fundamentos. *Domínguez Maldonado v. ELA*, 137 DPR 954, esc. 4 (1995). Véase, además, *Milán Rodríguez v. Muñoz*, *supra*, pág. 619; *Molina v. C.R.U.V.*, 114 DPR 295, 297 (1983). No obstante, dichas normas no implican que debamos abdicar nuestro rol como árbitro final de la Constitución y celoso guardián de los derechos constitucionales de los ciudadanos y ciudadanas.

Cónsono con lo anterior, en ocasiones los tribunales nos enfrentamos a disposiciones estatutarias o reglamentarias que requieren nuestra interpretación por haber sido redactadas en términos vagos o ambiguos. Ahora bien, vaguedad y ambigüedad no son sinónimos, por lo que ello requiere que nos expresemos respecto a cuál es la diferencia entre ambos y qué implicaciones tiene dicha clasificación al momento de ejercer nuestra función revisora.

Una expresión ambigua es aquella que es susceptible de dos o más significados por lo que se requiere identificar, precisamente, cuál de las posibles definiciones es la correcta. Véase, Jorge Farinacci Fernós, *Ambigüedades y vaguedades en el derecho administrativo puertorriqueño,* 51 Rev. Jur. UIPR 497, 498 (2017). Normalmente, la ambigüedad es producto de imprecisión lingüística o gramatical y es a través del contexto que podemos decidir cuál es el significado correcto. *Íd.* en la pág. 499. De surgir alguna ambigüedad en el texto de una disposición estatutaria o reglamentaria, el tribunal debe asegurarse que la interpretación que realice cumpla con los propósitos de su adopción, por lo que debemos atribuirle un sentido que asegure el resultado que la Asamblea Legislativa o la agencia administrativa quiso obtener. Véase, *Rosado Molina v. ELA*, *supra*, págs. 589-90; *Cordero et al., v. A.R.Pe*, *supra*, pág. 456. **Por ello, se rechazará una interpretación literal y forzada que conduzca a un resultado que no pudo**

**haber sido el contemplado.** *IFCO Recycling, Inc. v. Aut. Desp. Sólidos*, 184 DPR 712, 740 (2012); *Asoc. Fcias. v. Caribe Specialty II*, *supra*, pág. 939; *Otero de Ramos v. Srio. de Hacienda*, 156 DPR 876, 884 (2002).

Por el contrario, una ley adolece de vaguedad si sus prohibiciones no están claramente definidas, por lo que una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir, lo que se presta para una aplicación arbitraria y discriminatoria. *Danosa Caribbean, Inc. v. Neg. Asist. Contr.*, 185 DPR 1008, 1029 (2012); *Pueblo v. APS Healthcare of P.R.*, 175 DPR 368, 377-78 (2009); *Pacheco Fraticelli v. Cintrón Antosanti*, *supra*, págs. 239-40. Para prevenir dicha aplicación, éstas deben proveer normas claras para aquellas personas encargadas de ponerlas en vigor. *Muñiz v. Admdor. Deporte Hípico*, *supra*, pág. 34 (Hernández Denton, opinión de conformidad); *U.N.T.S. v. Srio. de Salud*, *supra*, pág. 161; *Velázquez Pagán v. A.M.A.*, *supra*, pág. 577; *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145-146 (1973).

A esos fines, en el contexto administrativo, la herramienta a utilizarse para resolver la ambigüedad estatutaria usualmente es la interpretación. Farinacci Fernós, *supra*, en la pág. 502. Recordemos que la Asamblea Legislativa no actuó con suficiente precisión lingüística o gramatical, u optó por el silencio, por lo que corresponde utilizar herramientas de interpretación judicial para

resolver la ambigüedad y dar el significado a la disposición estatutaria en cuestión. *Íd*. en la pág. 503. En algunas instancias, la agencia ya ha realizado una interpretación respecto a la disposición ambigua, en cuyo caso procede que apliquemos los principios de hermenéutica aquí discutidos, así como los parámetros para la revisión judicial esbozados en la sección anterior.

Por último, conviene señalar aquí que según el Artículo 15 del Código Civil, "las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces". 31 LPRA sec. 15. Véase, *Sucn. Toro v. Sucn. Toro*, 11 DPR 391 (2004). Si el estatuto no contiene una definición del término en controversia -- tal como ocurre en el caso de autos con el término "predios" -- éste debe entenderse en el sentido ordinario y usual que se le asigna, tomando en consideración que la interpretación judicial debe realizarse con fines socialmente útiles. *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 669 (2014); *Sánchez Díaz v. ELA*, 181 DPR 810, 825 (2011).

Es pues, a la luz de la normativa antes expuesta, que procedemos a disponer del caso ante nos.

VI.

Como mencionamos anteriormente, en el presente caso, Point Guard, en esencia, sostiene que el Tribunal de Apelaciones erró al confirmar cierta *Resolución* del

Comisionado de Seguros en la que se le imputa haber incurrido en una de las conductas anticompetitivas prohibidas por la Ley de Seguro de Responsabilidad Obligatorio, *supra*. En particular, el Comisionado de Seguros sostiene que Point Guard violó la precitada ley al repartir material promocional sobre el seguro que ofrece, en los predios de una entidad autorizada para el cobro del seguro de responsabilidad obligatorio. Le asiste la razón a Point Guard.

De entrada, es menester señalar que la conducta realizada por la persona frente a la colecturía -- entiéndase la entrega de material promocional de Point Guard -- constituye una expresión comercial relacionada a una actividad lícita y no engañosa. En consecuencia, la misma está protegida por la cláusula constitucional de la libertad de expresión.

Ahora bien, como si lo anterior no fuera suficiente, debemos recordar que las aceras públicas en nuestro país se consideran foros públicos tradicionales y, como tal, ocupan una posición especial en términos de la protección que ofrece el Artículo II, Sección 4, de nuestra Constitución. Las aceras públicas no pierden su clasificación como foro público tradicional por el simple hecho de que transcurran por una propiedad del gobierno que ha sido dedicada a otros fines que no sean la expresión de los ciudadanos y ciudadanas. Ello es el caso de la acera pública aquí en controversia, la cual transcurre por el edificio de varias

entidades y oficinas gubernamentales no dedicadas a la expresión, entre ellas, la Colecturía de Rentas Internas.

Evidentemente, el hecho de que la enmienda realizada en 2015 a la Ley de Seguro de Responsabilidad Obligatorio, *supra*, haya aclarado que la prohibición a las gestiones de mercadeo de las aseguradoras no tenía el alcance de prohibir dicha conducta fuera de los predios de la entidad autorizada o en la vía y aceras públicas, denota la intención del legislador de preservar el derecho a la expresión y, consecuentemente, salvaguardar la constitucionalidad de la precitada ley.

Así pues, resolvemos que el término "predios" de una entidad autorizada, conforme se establece en la Ley de Seguro de Responsabilidad Obligatorio, *supra*, no incluye las aceras o calles públicas que por dichas entidades transcurran, independientemente de la distancia a la que se encuentren y de si sólo tienen el propósito de servir a determinada entidad o, en la alternativa, a varios edificios. Tampoco es relevante que las personas que acudan a la Colecturía utilicen dicho paso.

La anterior conclusión es el resultado más sensato, lógico y razonable y, a su vez, es cónsona con nuestra ineludible tarea de velar porque tanto las leyes promulgadas por la Asamblea Legislativa, como también las actuaciones de las agencias administrativas, sean conformes a los imperativos constitucionales.

Siendo ello así, somos del criterio que la interpretación realizada por la Oficina del Comisionado de Seguros -- la cual fue sostenida por el Tribunal de Apelaciones -- en cuanto a lo que constituye el concepto "predios" contemplado en la Ley de Seguro de Responsabilidad Obligatorio, *supra*, así como en las cartas normativas, incide sobre el derecho a la libertad de expresión y no puede sostenerse. Recordemos que la doctrina de la deferencia a los dictámenes administrativos cede cuando dicho organismo ha actuado de manera arbitraria, caprichosa o irrazonable. Tal es el caso de autos. Se cometieron, pues, los errores señalados.

## VII.

Por los fundamentos antes expuestos se revoca la *Sentencia* del Tribunal de Apelaciones, así como la *Resolución* de la Oficina del Comisionado de Seguros. En consecuencia, se dejan sin efecto la *Orden* de cese y desista y la multa administrativa aquí impuesta.

Se dictará Sentencia de conformidad.

Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina del Comisionado de
Seguros de Puerto Rico

    Recurrida

                v.

Point Guard Insurance Company,
Inc.

    Peticionaria

                            CC-2019-479    *Certiorari*

SENTENCIA

En San Juan, Puerto Rico a 4 de diciembre de 2020.

Por las razones expuestas en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la *Sentencia* del Tribunal de Apelaciones, así como la *Resolución* de la Oficina del Comisionado de Seguros. En consecuencia, se dejan sin efecto la *Orden* de cese y desista y la multa administrativa aquí impuesta.

Lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres concurre con opinión escrita a la que se unen la Jueza Presidenta Oronoz Rodríguez y la Jueza Asociada señora Pabón Charneco. La Jueza

Presidenta Oronoz Rodríguez concurre con el resultado y hace constar la siguiente expresión:

Concurro con el resultado al que llegó este Tribunal por entender que los foros inferiores erraron al penalizar a la aseguradora por una conducta que no está prohibida por ninguna Ley. Por el contrario, la conducta está permitida expresamente por el Art. 9 de la Ley del Seguro de Responsabilidad Obligatorio de Vehículos de Motor, Ley Núm. 153-1995, 26 LPRA sec. 8057a (Ley del Seguro Obligatorio). Ante ello, para llegar a esa determinación no era indispensable hacer un análisis constitucional al amparo del derecho a la libertad de expresión comercial. Ese análisis es innecesario para resolver la controversia ante los hechos específicos de este caso y, más aún, ninguna parte levantó ese argumento. Por lo tanto, no se justifica expresarnos sobre el particular.

Conforme a la doctrina de autolimitación judicial, hemos sostenido que "los tribunales no considerar[emos] el aspecto constitucional de una medida legislativa cuando se pueda atender el asunto mediante un análisis estatutario". Brau, Linares v. ELA, 190 DPR 315, 337-338 (2014). Un estudio puramente estatutario —como el que también incluye el dictamen mayoritario— era suficiente para revelar, sin lugar a duda, la intención inequívoca del legislador de excluir a las vías y aceras públicas como espacios en los que se prohíbe repartir el material promocional en controversia. Ese análisis sustenta la intención expresa y sin ambages del legislador según consta en el Art. 9 de la Ley del Seguro Obligatorio, supra. Una vez se precisó que la persona representante de la aseguradora se encontraba en una acera pública, nuestro análisis se debió limitar a determinar si, al amparo de esa Ley, la conducta estaba prohibida.

Según Art. 9 de la Ley del Seguro Obligatorio, supra, constituirá conducta anticompetitiva, entre otras, que una aseguradora participante del Formulario de Selección realice ciertas gestiones de mercadeo y publicidad dentro de los predios de una entidad autorizada para el cobro del seguro de responsabilidad obligatorio. No obstante, ese

artículo también dispone que esa "prohibición no impide que los aseguradores lleven a cabo publicidad, promociones o gestiones de mercadeo fuera de los predios de la entidad autorizada para el cobro del seguro de responsabilidad obligatorio **o en la vía y aceras públicas**". Art. 9, Ley del Seguro Obligatorio, <u>supra</u>. (Énfasis suplido). En consecuencia, la aseguradora no incurrió en una conducta que la Ley del Seguro Obligatorio, <u>supra</u>, penalice. Los foros inferiores erraron al resolver lo contrario.

El Juez Asociado señor Kolthoff Caraballo no intervino.


                              José Ignacio Campos Pérez
                           Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina del Comisionado de Seguros de Puerto Rico

      Recurrida

        v.

Point Guard Insurance Company, Inc.

      Peticionaria

CC-2019-0479

Opinión Concurrente emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la que se unen la Jueza Presidenta Oronoz Rodríguez y la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 4 de diciembre de 2020.

La Oficina del Comisionado de Seguros le impuso una multa de $25,000 a Point Guard Insurance Company ("Point Guard") por infringir el Artículo 9(a)(v) de la Ley Núm. 253-1995, mejor conocida como la Ley del Seguro de Responsabilidad Obligatorio para Vehículos de Motor, *infra*. Nos corresponde determinar si el Tribunal de Apelaciones erró al confirmar esa resolución, tras concluir que Point Guard incurrió en una conducta anticompetitiva al repartir material promocional sobre el seguro que ofrece, en los "predios de una entidad autorizada" para su cobro.

Estoy de acuerdo con la Opinión del Tribunal en cuanto a que el término "predios de una entidad autorizada", en la Ley del Seguro de Responsabilidad Obligatorio para Vehículos de Motor, infra, no incluye las aceras públicas. Sin embargo, ya que entiendo que este asunto se puede resolver mediante un análisis estatutario, sin tener que entrar a un análisis constitucional, me veo en la obligación de concurrir con el resultado al cual llega este Tribunal.

I.

El trasfondo fáctico y procesal de la controversia está adecuadamente reseñado en la Opinión del Tribunal. En resumen, la Oficina del Comisionado de Seguros emitió una orden de cese y desista, e impuso una multa administrativa, a Point Guard, aseguradora autorizada por la Oficina del Comisionado de Seguros para suscribir negocios de seguros en Puerto Rico. El comisionado concluyó que la compañía aseguradora actuó en contravención de la Ley del Seguro de Responsabilidad Obligatorio para Vehículos de Motor, porque Point Guard intervino supuestamente en el proceso individual de selección de seguros, al repartir material promocional en la acera pública. A juicio de la Oficina del Comisionado de Seguros, la acera es parte de los predios de la Colecturía de Rentas Internas.

Los hechos ocurrieron cuando el señor Fortunato Colón Parrilla, agente investigador de la División de Conducta de Mercado de la Oficina del Comisionado de Seguros, observó que cerca de la puerta de la Colecturía de Rentas Internas del Departamento de Hacienda ubicada en el Edificio Capital Center en Hato Rey, una persona repartía folletos promocionales de un seguro que ofrecía Point Guard. El señor Colón Parilla testificó que la persona que vio entregando el material de Point Guard en la Colecturía estaba frente a la puerta de entrada, en la acera pública. Esta era un área de libre acceso y sin restricción alguna al público.

Finalizado el desfile de prueba, Point Guard presentó una moción de desestimación ("non-suit"), porque la agencia supuestamente no contaba con evidencia suficiente que sustentara la violación alegada. Esbozó varios señalamientos de error conforme a los cuales solicitó que se dejara sin efecto la orden dictada. Entre estos planteó que, conforme al testimonio del investigador, así como a las fotos presentadas en evidencia, la persona que estaba entregando el material promocional se encontraba en una acera pública, por lo que no se configuró la conducta anticompetitiva que la Ley de Seguro de Responsabilidad Obligatorio prohíbe. Alegó que la ley solo prohíbe las gestiones de mercadeo o promoción dentro de los predios de las entidades autorizadas para el cobro del seguro de responsabilidad obligatorio y la acera pública donde se

encontraba la persona no podía considerarse como predio de la Colecturía. Sostuvo que el propio agente investigador concluyó en su testimonio que la persona se encontraba en la acera pública, que se podía caminar por ella libremente y que no había portones ni barreras.

Sin embargo, evaluada la prueba documental y testifical, el Comisionado de Seguros concluyó que la persona que repartía la publicidad de Point Guard estaba justo frente a la puerta de la Colecturía. Por lo tanto, concluyó que la aseguradora exhibió su nombre y logo, y repartió folletos promocionales de su seguro, en los predios de una entidad autorizada para el cobro del seguro de responsabilidad obligatorio, interviniendo así con el proceso de selección de los asegurados, lo cual constituyó una violación del Artículo 9 de la Ley del Seguro de Responsabilidad Obligatorio, infra, y las cartas normativas, infra. Ante ello, declaró no ha lugar la moción de desestimación y confirmó la orden de cese y desista, así como la multa impuesta.

Inconforme con la determinación del Comisionado de Seguros, Point Guard presentó un recurso de revisión judicial ante el Tribunal de Apelaciones. Este último confirmó a la agencia y razonó que, aunque el acceso a la entrada de la Colecturía es libre, la acera frente a la puerta de la Colecturía forma parte de sus predios, ya que ese término no se circunscribe al área interior del local.

En desacuerdo, Point Guard acude ante nos mediante *certiorari*.

II.

Mediante la Ley del Seguro de Responsabilidad Obligatorio, Ley Núm. 253-1995, 26 LPRA sec. 8051 et seq.*,* se adoptó en Puerto Rico un sistema de seguro de responsabilidad obligatorio para cubrir los daños ocasionados a los vehículos de motor, a causa de accidentes de tránsito. En 2014 la ley sufrió una enmienda con el fin de propiciar la creación de un ambiente de competencia sana y equitativa, en el que los consumidores pudieran seleccionar al asegurador de su preferencia. Véase, Exposición de Motivos, Ley Núm. 245-2014. Se añadió entonces el Art. 9, que disponía:

> Incurrirá en incumplimiento con esta Ley cualquier aseguradora, la Asociación de Suscripción Conjunta o entidad autorizada para el cobro del seguro de responsabilidad obligatorio que de cualquier manera intervenga indebidamente en el proceso de selección del asegurado con el fin de favorecer a una aseguradora sobre otra, incluyendo a la Asociación de Suscripción Conjunta, provea información falsa sobre otro asegurador o sobre el proceso de selección, haga la selección por el asegurado o lleve a cabo cualquier otra acción que tenga como efecto intervenir indebidamente en el proceso de libre selección del asegurado en cuanto a su proveedor del seguro de responsabilidad obligatorio. Lo anterior no excluye que las aseguradoras y la Asociación de Suscripción Conjunta o cualquier representante de éstas, lleve a cabo gestiones de promoción y mercadeo relacionados a la venta del seguro obligatorio.

Así, el 21 de mayo de 2015, la Oficina del Comisionado de Seguros promulgó la Carta Normativa Núm. CN-2015-189-LR, dirigida a todas las entidades autorizadas para el cobro del seguro obligatorio y aseguradoras participantes, para atender lo relacionado a los procedimientos de selección del seguro y la implementación de la Ley Núm. 245-2014, supra. El inciso G de la parte V, estableció que "[n]ingún asegurador procurará que una [entidad autorizada para el cobro del seguro de responsabilidad obligatorio] publique, divulgue o entregue directa o indirectamente información o material publicitario … o intente influenciar o induzca a los consumidores a la selección de un [seguro de responsabilidad obligatorio] en particular". Carta Normativa Núm. CN-2015-189-LR, pág. 10. Sin embargo, aclaró que ello "no excluye que los aseguradores del [Seguro de Responsabilidad Obligatorio] … lleven a cabo gestiones de promoción o mercadeo relacionadas a la venta del seguro de responsabilidad obligatorio fuera de las facilidades y la totalidad de los predios de una [entidad autorizada]". Id. Posteriormente, mediante la Ley Núm. 201-2015 se enmendó el Art. 9, como sigue:

Artículo 9. – Conductas anticompetitivas, procedimientos y penalidades.

(a) Conductas anticompetitivas: Constituirá una conducta anticompetitiva en el mercado del seguro de responsabilidad obligatorio cuando un asegurador participante del "Formulario de Selección", incluyendo la Asociación de

Suscripción Conjunta, incurra en alguna de las siguientes actuaciones:

(i)…

(v) Hacer gestiones de mercadeo, colocar publicidad, entregar o colocar promoción relacionada con un producto de seguro de responsabilidad obligatorio una aseguradora participante del "Formulario de Selección", incluyendo la Asociación de Suscripción Conjunta, **dentro de los predios de una entidad autorizada** para el cobro del seguro de responsabilidad obligatorio o promover que se coloque dicha publicidad o promoción. **Esta prohibición no impide que las aseguradoras lleven a cabo publicidad, promociones o gestiones de mercadeo fuera de los predios de la entidad autorizada para el cobro del seguro de responsabilidad obligatorio o en la vía y aceras públicas.** (Énfasis suplido) Art. 9 de la Ley Núm. 253-1995, según enmendada, 26 LPRA sec. 8057a.

Como vemos, el legislador dispuso expresamente que la prohibición a las gestiones de mercadeo de las aseguradoras no tenía el alcance de prohibir esa conducta fuera de los predios de la entidad autorizada o en "la vía y aceras públicas".

Asimismo, el 31 de diciembre de 2016, la Oficina del Comisionado de Seguros, el Departamento de Hacienda y el Departamento de Transportación y Obras Públicas emitieron, en conjunto, la Carta Normativa Núm. CN-2016-212-AL. Allí se refirmó que no se permitiría a ningún asegurador, ni sus agentes gestores o a persona alguna, llevar a cabo gestiones de promoción, mercadeo, solicitación y ventas dentro de las facilidades y predios de las Colecturías de Rentas Internas. De igual forma, aclararon que la anterior

prohibición "no impide que los aseguradores lleven a cabo publicidad, promociones o gestiones de mercadeo fuera de los predios de la entidad autorizada para el cobro del seguro de responsabilidad obligatorio o en la vía y aceras públicas". Carta Normativa Núm. CN-2016-212-AL, pág. 6.

III.

Como menciona la Opinión del Tribunal, "[e]videntemente, el hecho de que la enmienda realizada en 2015 a la Ley de Seguro de Responsabilidad Obligatorio, supra, haya aclarado que la prohibición a las gestiones de mercadeo de las aseguradoras no tenía el alcance de prohibir dicha conducta fuera de los predios de la entidad autorizada o en la vía y aceras públicas, denota la intención del legislador…". Véase, Opinión, pág. 34.

En efecto, cuando una ley es clara y libre de ambigüedad, el texto comunica lo que la Asamblea Legislativa quiso hacer. Véanse, Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14; Cordero Jiménez v. UPR, 188 DPR 129, 138 (2013); S.L.G. Rivera Carrasquillo v. A.A.A., 177 DPR 345, 362 (2009). Por consiguiente, hemos establecido que "el primer paso al interpretar un estatuto es remitirnos al propio texto de la ley, puesto que cuando el legislador se ha expresado en un lenguaje claro e inequívoco, el propio texto de la ley es la expresión por excelencia de la intención legislativa". Cordero et al. v. ARPe et al., 187 DPR 445, 456 (2012). En estos casos, no

hay necesidad de indagar más allá de la ley para cumplir con su propósito. Rosa Molina v. ELA, 195 DPR 581, 589 (2016).

Cónsono con lo anterior y basándonos en la doctrina de autolimitación judicial, hemos sostenido que un tribunal tiene que hacer lo posible para evitar los dictámenes precipitados o innecesarios en cuestiones constitucionales y debe decidir esas cuestiones solo cuando no pueda disponer de otra manera del caso ante su consideración. Milán Rodríguez v. Muñoz, 110 DPR 610, 619 (1981). Al respecto, hemos expresado que "los tribunales **no** considerarán el aspecto constitucional de una medida legislativa cuando se pueda atender el asunto mediante un análisis estatutario". Brau, Linares v. ELA, 190 DPR 315, 337-38 (2014) (énfasis suplido). De esta forma, en nuestra jurisdicción los planteamientos constitucionales no deben abordarse cuando un caso puede resolverse mediante una de las siguientes maneras: (1) **mediante un análisis estatutario válido**; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una interpretación razonable de la legislación que permita soslayar la cuestión constitucional; y (4) porque la controversia puede quedar resuelta definitivamente por otros fundamentos. Véase, Domínguez Maldonado v. ELA, 137 DPR 954, esc. 4 (1995).

Como vemos, para la fecha de la publicación de la carta normativa Núm. CN-2015-189-LR, la Asamblea Legislativa no se había expresado todavía sobre la divulgación del material en la vía o aceras públicas. Sin embargo, tras la publicación de esa carta normativa, la Asamblea Legislativa enmendó nuevamente la Ley de Seguro de Responsabilidad Obligatorio, _supra_, mediante la Ley Núm. 201-2015, _supra_. Allí, el legislador limitó la prohibición a las aseguradoras y estableció expresamente que en las vías y aceras publicas sí se puede repartir material promocional del Seguro de Responsabilidad Obligatorio. Se desprende que, incluso con el beneficio de la carta normativa, el legislador decidió que era importante expresar, mediante legislación, que la prohibición excluye a las vías y aceras públicas.

Por lo tanto, según la ley, las aceras públicas nunca pueden formar parte de "los predios de una entidad autorizada". Por consiguiente, si una persona está repartiendo material promocional en la acera pública no está violando la ley, aunque esté parada frente a la puerta de la Colecturía de Rentas Internas. No se requiere ulterior análisis. Por lo tanto, ante la admisión del agente investigador de que la persona se encontraba en la acera publica, no hay fundamento legal para sostener la multa impuesta a Point Guard. Sencillamente, no hay ley que penalice la conducta incurrida.

IV.

Por todo lo anterior, coincido con el resultado al que llega el Tribunal. Sin embargo, como considero innecesario el análisis constitucional que se hace en la Opinión mayoritaria, concurro respetuosamente.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado